**UNITED STATES of America,
Appellant,**

v.

**Daryls Foster STEED, Appellee.**

No. 79–5294.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1981.

Decided March 25, 1982.

John S. Edwards, U. S. Atty., Jean B. Weld, Asst. U. S. Atty., Roanoke, Va., for appellant.

Craig T. Redinger, Charlottesville, Va., for appellee.

Before WINTER, Chief Judge, and BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges.

BUTZNER, Circuit Judge:

The United States appeals from the district court's judgment of acquittal of Darlys Foster Steed after a jury found her guilty of mail fraud and furnishing a false statement to a government agency. We reach the following conclusions with respect to the four issues the appeal raises: (1) we have jurisdiction to hear the appeal; (2) we can review the district court's assessment of the sufficiency of the evidence; (3) the district court erred when it held that the evidence was insufficient to sustain the jury's verdict; (4) the district court did not err in the admission of evidence, and its alternative grant of a new trial is unwarranted. Consequently, we vacate the judgment of acquittal and remand the case for reinstatement of the verdict of the jury and entry of judgment against Steed.[1]

## I

■ Although the Supreme Court has not decided the precise jurisdictional question raised by this appeal, its decisions construing the Criminal Appeals Act of 1970, 18 U.S.C. § 3731, and the double jeopardy clause of the fifth amendment dispense with the need for extended discussion. The Court has held that by enacting § 3731

Congress "intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975). Thus, the meaning of the double jeopardy clause becomes critical to the government's right of appeal.

Recently in the course of reviewing the principles derived from this clause, the Court pointed out that "the Double Jeopardy Clause does not bar a Government appeal from a ruling in favor of the defendant after a guilty verdict has been entered by the trier of fact." *United States v. DiFrancesco*, 449 U.S. 117, 130, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980). To illustrate this dictum, the Court cited two cases that held that the government could appeal judgments of acquittal based on the insufficiency of the evidence to sustain the verdicts of guilty.[2] The Court explained the rationale for this principle in *United States v. Wilson*, 420 U.S. at 344–45, 95 S.Ct. at 1022–23:

> [W]here there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended. In various situations where appellate review would not subject the defendant to a second trial, this Court has held that an order favoring the defendant could constitutionally be appealed by the Government. Since the 1907 Criminal Appeals Act, for example, the Government has been permitted without serious constitutional challenge to appeal from orders arresting judgment after a verdict has been entered against the defendant.... Since reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution.

*States v. Dixon*, 658 F.2d 181, 187–88 (3d Cir. 1981); *United States v. Boyd*, 566 F.2d 929, 931–33 (5th Cir. 1978); *United States v. Calloway*, 562 F.2d 615, 616–17 (10th Cir. 1977); *United States v. Blasco*, 581 F.2d 681, 682–84 (7th Cir. 1978); *United States v. Donahue*, 539 F.2d 1131, 1133–34 (8th Cir. 1976).

Dictum to the contrary in *United States v. Burroughs*, 564 F.2d 1111, 1118 (4th Cir. 1977), can no longer be considered a guide to the law of this circuit.

1. A panel held that this court had jurisdiction to hear the government's appeal but that it should defer to the trial court's assessment of the evidence. Accordingly, the panel affirmed the judgment of acquittal. *United States v. Steed*, 646 F.2d 136 (4th Cir. 1981). We granted the government's petition for rehearing en banc.

2. *United States v. Rojas*, 554 F.2d 938, 941 (9th Cir. 1977); *United States v. De Garces*, 518 F.2d 1156, 1159 (2d Cir. 1975); *accord, United*

We therefore conclude that we have jurisdiction to hear the government's appeal, and we turn next to the question of the standard governing our review of the district court's judgment of acquittal.

## II

■ At the outset, we cannot accept the suggestion that we must accord absolute deference to the district court's determination that the evidence is insufficient. This standard of review, now pressed by Steed on rehearing, initially was prescribed by the panel for reasons cogently stated in its opinion.[3] Admittedly, this practice would achieve symmetry in the disposition of all judgments of acquittal based on insufficiency of the evidence whether granted before the case is submitted to the jury or after the verdict.[4] But the attainment of this goal would be at the expense of interests the Congress deemed important. By enacting 18 U.S.C. § 3731 to enable the government to appeal adverse judgments unless the "Constitution prohibits further prosecution," Congress did not act on the basis of any perception that the trial judge should be permitted to assess the evidence conclusively. On the contrary, it expressed its preference for appellate review to the extent permitted by the double jeopardy clause. In short, insofar as the Constitution permits, Congress granted the government an appeal of right no less expansive than that accorded to defendants. This change in policy, wrought by the Criminal Appeals Act of 1970, cannot be given effect by creating a standard of review that defers absolutely to the trial judge's assessment of the evidence.

■ The proper standard of review is enunciated in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942): "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." This is the familiar standard for review of a defendant's claim that the evidence is insufficient to sustain the jury's verdict of guilty. Whether the assessment of the evidence is at the behest of the government or the defendant, the function of the reviewing court is unchanged and consequently the same standard of review is appropriate. This, too, is the conclusion reached by other courts that have reviewed post-verdict judgments of acquittal.[5]

## III

■ The jury found Steed guilty of furnishing a false statement to the Department of Housing and Urban Development (HUD) in violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1717.[6] She also was found guilty of mail fraud for causing the false statement to be mailed to HUD in violation of 18 U.S.C. § 1341.

After return of the verdict, the district court entered a judgment of acquittal because "no rational finder of fact could have found proof of guilt beyond a reasonable

---

3. *See United States v. Steed*, 646 F.2d 136, 139–43 (4th Cir. 1981).

4. When a judgment of acquittal based on insufficiency of the evidence is entered before the case is submitted to the jury, the double jeopardy clause bars a second trial at which the government could attempt to remedy the deficiencies of its proof. *Fong Foo v. United States* 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). The Court reached the same result in *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), where the double jeopardy clause barred the government from appealing a judgment of acquittal based on insufficient evidence after the jury deadlocked. Reversal of the judgment would have subjected the defendant to retrial on the issue of the sufficiency of the evidence.

5. *See United States v. Dixon*, 658 F.2d 181, 188 (3d Cir. 1981); *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979); *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir. 1978); *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977); *United States v. Calloway*, 562 F.2d 615, 617 (10th Cir. 1977).

6. The district court granted a judgment of acquittal at the conclusion of the government's case on another count charging a violation of 15 U.S.C. § 1717. The government has not appealed this judgment.

doubt on the evidence that was before the jury. . . ." [7]

To sustain the charge of violating 15 U.S.C. § 1717, the government had to prove that Steed willfully made an untrue statement of material fact in her application to HUD. *See United States v. Steinhilber*, 484 F.2d 386, 389–90 (8th Cir. 1973). To sustain the charge of mail fraud, the government was required to prove that Steed participated in a scheme to defraud and that she caused the mails to be used to execute or further the scheme. *See Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Both statutes require proof of a specific intent to defraud.

The Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, *et seq.*, is a comprehensive statute requiring subdivision developers, unless exempt, to furnish prospective purchasers pertinent information about lots offered for sale.[8] Among other things, the developer must disclose a description of access to the property, the availability of facilities for sewage, water, and other utilities, and the nature of the improvements to be installed by the developer. The Act subjects developers who furnish false information to both civil liability and criminal penalties.

Section 1702 authorizes the Secretary of HUD to exempt developers from complying with the Act if he finds enforcement is not necessary for the public interest because of the "small amount involved or the limited character of the public offering." Pursuant to this authority, the Secretary promulgated 24 C.F.R. § 1710.14 (1974) exempting subdivisions of less than 300 lots that met certain other conditions. In addition to releasing the developer from complying with the Act, exemption substantially reduces the filing fee.

Steed was president and sole stockholder of Parkway Development Corporation, which was formed to sell 86 lots comprising a subdivision carved from a 460 acre tract owned by Thomas Beasley. Parkway, as a result of representations made by Steed that only 86 lots were involved, received an exemption from HUD. To procure this ex-

7. Other pertinent extracts from the court's oral opinion amplify its decision:

[T]he Court is aware of the fact that Mr. Steed and Mr. Beasley have been acquitted [of conspiracy to commit larceny by false pretenses] in the Circuit Court of Floyd County. And from the evidence that the Court heard here during this trial, I don't think anyone at all could dispute the fact that Mr. Beasley and Mr. Steed were the prime movers in the development. And it just does not seem to this Court fair to convict this lady, who was way out on the perimeter, of a crime growing out of this development when Mr. Steed and Mr. Beasley have both been acquitted. It just does not seem justice.
    . . . [I]f the Court had found sufficient evidence for the jury's verdict, the Court would still have set aside the verdict in this case as to each count, because the Court feels like that the evidence as to the purchasers who came here and testified was highly prejudicial to the defendant. And that the prejudicial [effect] of their testimony far outweighed any probative value that their testimony might have had in the case.
    I think the Court was in error when it permitted these witnesses to testify. So, I'm hoping, if the government takes the case to the Court of Appeals, the Court of Appeals will look at that facet of the case also. And if it is to come back, would advise the Court

as to whether or not it would be proper to have admitted in evidence this testimony.
    But the Court feels that there is not sufficient evidence in the case, looking at the evidence in a light most favorable to the government, drawing every reasonable inference that could be drawn therefrom, there just is not sufficient evidence to convict this lady of these charges beyond a reasonable doubt.

8. Section 1701(3) provides:

    "subdivision" means any land which is divided or proposed to be divided into fifty or more lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan and where subdivided land is offered for sale or lease by a single developer, or a group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.
    Section 1701(4) provides:
    "developer" means any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision.

emption, Steed certified: "There is no additional land owned or under option or other consideration for purchase by the developer that might be offered as part of a common promotional plan." The indictment alleged that this statement was false.

Steed contends that the evidence was insufficient to show a common promotional plan and that even if there were such a plan, it evolved after she made the certification. Consequently, she asserts, the evidence was insufficient to show that she acted with fraudulent intent. At the most, she protests, she was simply a figurehead for her husband's and Beasley's enterprise.

Neither Steed nor her husband testified, so the jury had to ascertain from circumstantial evidence the extent of her knowledge about a common promotional plan to sell lots in more than one subdivision and whether she had a fraudulent intent when she applied to HUD for the exemption. The proof established that Steed had experience in the promotion and advertising of subdivision lots. She owned and operated Incentive Productions, Inc., a Memphis, Tennessee, company which engaged in this business. Her company received more than $66,000 from the sale of Parkway lots. In addition, she received over $40,000 in commissions and reimbursement for expenses.

The evidence also disclosed that if Beasley's 460 acre tract were marketed as a single subdivision, it would not qualify for exemption from the Act. To procure exemption, Beasley ultimately used three development corporations to offer lots in contiguous subdivisions. The first of these corporations was Parkway of which Steed was the president and sole stockholder. She did not own stock in the other two. Parkway was allotted 86 lots, and Steed agreed that Beasley was to receive two-thirds of the profits from their sale. Thus, Steed knew that Beasley was participating in the receipts from the sale of land which he had formerly owned and which he had conveyed to Parkway. By the terms of the Act, § 1701(4), Beasley was one of the developers of the Parkway subdivision. In her application to HUD, Steed did not disclose Beasley's silent interest.

The critical question raised by Steed is whether the evidence disclosed that she applied for the exemption with knowledge of Beasley's plans to market his remaining land through other contiguous subdivisions. If she were ignorant of his plans, there would be merit in her contention that her certification concerning the absence of a common promotional plan was innocently made. Conversely, if she were aware of the plan to sell the remaining lots, the jury could find that she acted with fraudulent intent. There is proof that Steed's husband knew of Beasley's plan but no evidence that he in turn told Steed. Nevertheless, there is ample evidence from which the jury could find beyond doubt that Steed was also informed of Beasley's plans for other contiguous subdivisions.

The same lawyer represented the Steeds and Beasley. After he prepared the application for exemption, he explained it to Steed, her husband, and Beasley. He specifically called their attention to the certification of the absence of a common promotional plan. He testified that he cautioned them as follows:

As part of a promotional scheme, and this was discussed with everybody that there had to be separate sales offices, that there had to be separate sales managers, or teams, or whatever if you please, that each section would be autonomous in and of itself, that each one of the sub-divisions that were set up would function on its own feet, and it was set up for that purpose.

The only subdivisions the parties contemplated were those formed from the 460 acre tract. When the lawyer referred to "each section" and "each one of the sub-divisions," he was referring not merely to the Parkway subdivision but to the other subdivisions of the entire 460 acre tract. Thus, the jury was justified in finding that when Steed applied for the exemption, she was aware, contrary to her certification, that Beasley, who had a substantial, silent interest in Parkway, planned to subdivide his remaining land and that Parkway was simply a part of a common promotional plan to sell the whole 460 acre tract.

Notwithstanding the lawyer's advice, Steed's promotion company sent mailgrams offering sweepstake prizes to prospective purchasers of lots not only in the Parkway subdivision but in other contiguous subdivisions that were formed from the common tract. Furthermore, the same project managers, salesmen, sales offices, and bookkeeper were used for all of the subdivisions. The evidence shows beyond doubt that Steed was aware of these arrangements and participated in them. Moreover, Steed did not confine her activities to the sale of the 86 Parkway lots. Almost seven months after these lots had been sold, Steed told an employee, who was concerned with the other subdivisions, that she was the boss. It is quite apparent that Steed did not consider herself to be a mere figurehead.

We therefore conclude that the evidence, viewed in the light most favorable to the government, amply supports the jury's verdict that Steed violated 15 U.S.C. § 1717 by intentionally furnishing a false statement of material fact to HUD.

The evidence also sufficed to show that Steed caused the mail to be used to further the fraudulent scheme to deceive HUD. Steed's lawyer acted on behalf of Steed and her corporation when he prepared and personally mailed Steed's signed application to HUD. The jury could find beyond a reasonable doubt that Steed knew that delivery of the papers to HUD was essential to the success of the scheme and that in the ordinary course of business her lawyer would mail them. It was not necessary for the government to prove that Steed personally mailed the application. Proof that her lawyer, acting as her agent, mailed the papers or proof that use of the mails "can reasonably be foreseen" is sufficient to sustain the conviction. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954); *United States v. Kenofskey*, 243 U.S. 440, 443, 37 S.Ct. 438, 439, 61 L.Ed. 836 (1917). Under either theory, the evidence is sufficient to sustain the

verdict that Steed violated 18 U.S.C. § 1341 by causing the mail to be used for the purpose of executing the fraudulent scheme to deceive HUD.

## IV

Before addressing the merits of the district court's conditional grant of a new trial, which the parties have fully briefed, discussion of our jurisdiction to review this aspect of the case is appropriate.[9] Quite understandably, Federal Rule of Criminal Procedure 33 pertaining to new trials, which was last amended in 1966, does not deal with a situation that could arise only after passage of the Criminal Appeals Act of 1970, 18 U.S.C. § 3731. The Supreme Court, however, has pointed out that the same final judgment rule applies in criminal as well as civil cases. *Parr v. United States*, 351 U.S. 513, 518, 76 S.Ct. 912, 916, 100 L.Ed. 1377 (1956). We therefore turn to Rule of Civil Procedure 50(c)(1) to determine the scope of the final judgment rule when a court grants judgment notwithstanding the verdict and conditionally grants a motion for a new trial. Under these circumstances, the finality of the judgment is not affected, and an appellate court can review the conditional grant of a new trial and in an appropriate case "reverse the conditional grant of the new trial and direct that judgment be entered on the verdict." Advisory Committee Notes to rule 50(c)(1). Conversely, the appellate court after reversing the judgment notwithstanding the verdict may allow the new trial.

■ Although we find no counterpart to rule 50(c)(1) in the criminal rules, we are satisfied that *Parr*, 351 U.S. at 518, 76 S.Ct. at 916, permits us in this instance to conform the interpretation of the final judgment rule in criminal cases to the interpretation set forth in rule 50(c)(1). We there-

---

9. Steed's brief correctly notes that the court's statement from the bench "in effect grants defendant's alternative motion for a new trial."

This seems also to be the intention of the district judge, for he observed that he expected this aspect of his ruling to be reviewed.

fore conclude that we have jurisdiction to reverse the conditional grant of a new trial.

■ The district court admitted testimony of three persons who told about the misrepresentations and broken promises salesmen made to them when they purchased lots. Steed objected to the testimony of one of these witnesses on the ground that the misconduct of the salesman could not be attributed to her and that it was prejudicial. The admission of this testimony, however, was not assigned as a ground for a new trial in Steed's written motion. Nevertheless, at the hearing on the motion, although the government protested that it was taken by surprise, the court permitted Steed to argue that the prejudice caused by this testimony justified a new trial. The district court agreed and conditionally granted a new trial.

We have some doubt that Rule of Criminal Procedure 33 permitted the judge to grant a new trial on a ground not set forth in the defendant's motion. *See United States v. Brown,* 587 F.2d 187, 189 (5th Cir. 1979). But even if the court could implicitly allow Steed to supplement the motion by oral argument, we find no error in the admission of the evidence. The testimony of the purchasers disclosed that the promotion of the sale of the lots was conducted in a manner that the Interstate Land Sales Full Disclosure Act prohibited. It was relevant to the issue pertaining to Steed's intention in seeking an exemption from the Act. The government was entitled to show why exemption was important to Steed and Beasley. For these reasons, we cannot conclude that the probative value of the evidence was outweighed by prejudice. *Cf. United States v. Amrep Corp.,* 560 F.2d 539, 545–46 (2d Cir. 1977). Accordingly, we hold that the conditional grant of a new trial must be reversed.

The district court's judgment of acquittal and its conditional grant of a new trial are reversed, and the case is remanded for rein-statement of the jury's verdict and further proceedings consistent with this opinion.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

With all the deference due from one occupying so outmanned a position, I respectfully dissent. The issue upon which I disagree with the court is of sufficient importance in the administration of criminal justice that it should at least be recognized as one not yet definitively addressed and resolved by the Supreme Court as that Court continues its exploration of the "relatively uncharted ground," *see* Comment, *Double Jeopardy and Government Appeals in Criminal Cases,* 12 Colum.J.L. & Soc.Prob. 295, 302 (1976), opened by the Criminal Appeals Act of 1970 (the Act or 1970 Act).

As more fully developed in the superseded panel opinion of the court, 646 F.2d 136, I believe that our review of a post-verdict judgment of acquittal should be limited to correcting errors of "pure" law [1] and should not extend to reexamining a district judge's determination made under correctly understood legal principles that the evidence was "factually" insufficient to convict.

The majority opinion simply assumes, in its Part II, that our review must necessarily extend as well to a determination that the evidence was insufficient to convict, and that the standard of review is necessarily the traditional standard for reviewing, at a criminal defendant's behest, a trial judge's unfavorable determination that the evidence *was* sufficient to convict. This assumption is not elaborated nor justified by the majority here, as it has not been by the other circuit courts that have made it. *See* 646 F.2d at 139 n.5. Implicit in it of course is the more fundamental assumption that by enacting the 1970 Act which allowed for the first time government appeals from post-verdict judgments of acquittal the Congress must have intended that this should be the standard of review. I do not think that assumption must or should be made.

---

1. See 646 F.2d 142 at & n.12.

Although in conjunction with the conferral of jurisdiction upon particular courts Congress may of course impose particular standards of review, *e.g.,* 5 U.S.C. § 706 (review of administrative agency determinations), it has not traditionally sought to do so in respect of criminal appeals, whether by defendants or the government.[2] Where no standards of review have been legislatively imposed, their definition is necessarily left to the appellate courts which—so far as I know—have laid down all extant standards in criminal appeals. My view therefore is that in expanding the scope of jurisdiction to review government appeals, the Criminal Appeals Act of 1970 simply does not speak to the nature of this (or any) standard of review, so that its definition is necessarily left to the courts for ordering under developed principles pertaining to the appropriate relationship between federal appellate and trial courts in the administration of criminal justice.

As the superseded panel opinion pointed out, 646 F.2d at 139–40, before the Criminal Appeals Act of 1970 there was no developed judicial standard for reviewing trial court determinations of evidence insufficiency. Operating under predecessor jurisdictional grants respecting both defendant and government appeals the courts had developed—without reference to the relevant jurisdictional grants—various standards for reviewing pure legal determinations both favoring and disfavoring defendants,[3] discretionary determinations running both ways,[4] and evidence sufficiency determinations disfavoring defendants.[5] But until the Criminal Appeals Act of 1970 first made possible any government appeals from post-verdict judgments of acquittal, no need or opportunity for developing or applying a standard by which to review the evidence sufficiency components of either pre- or post-verdict judgments of acquittal had been presented to the courts.

With both need and opportunity newly presented by the 1970 Act, I think the courts may and should now properly find the appropriate standard in the traditional principle of finality which has attended fact-based judgments of acquittal by trial judges. While it is apparently now settled that except as it protects against retrial this finality principle is not derived from the Double Jeopardy Clause,[6] I would hold that it remains a fundamental right of criminal defendants that exists independently of double jeopardy considerations and that was not affected by the Criminal Appeals Act of 1970. I find in the various post–1970 Act Supreme Court decisions exploring the previously "uncharted ground" opened by

2. There are no legislative prescriptions of review standards either external to or within the current statutory grants of appellate jurisdiction over defendant, 28 U.S.C. § 1291, or government, 18 U.S.C. § 3731, appeals in criminal cases.

3. The standard for reviewing legal determinations, whether favorable or unfavorable to defendants, is of course free review. *See, e.g., United States v. Burroughs,* 564 F.2d 1111 (4th Cir. 1977) (no legal error in post-verdict judgment of acquittal).

4. The standard for reviewing discretionary rulings, whether favorable or unfavorable to defendants, is the traditional one of abuse. *See, e.g., United States v. Wechsler,* 406 F.2d 1032 (4th Cir. 1969) (per curiam).

5. The standard for reviewing evidence sufficiency rulings unfavorable to defendants is whether there is "substantial evidence, taking the view most favorable to the government."

*Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

6. This much is implicit in the expressed view of a clear majority—perhaps the whole—of the Supreme Court that because the double jeopardy clause protects only against retrials after jeopardy has attached, post-verdict acquittals are not absolutely immunized from appellate review by the double jeopardy limitations built into the jurisdictional grant of the 1970 Act. *See, e.g., United States v. Wilson,* 420 U.S. 332, 342, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975) (post-verdict acquittal for pre-indictment delay appealable); *but cf. United States v. Martin Linen Supply Co.,* 430 U.S. 564, 576–81, 97 S.Ct. 1349, 1357–59, 51 L.Ed.2d 642 (1977) (Stevens, J., concurring: Congress did not intend by 1970 Act to allow appeals from acquittals, "and believed such appeals would be unconstitutional"; constitutionality of allowing such appeals not questioned).

the 1970 Act no outright or implicit rejection of that position.

Absolute finality is still insured for pre-verdict fact-based acquittals by their continued absolute jurisdictional insulation from any appellate review under the 1970 Act. *See Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). As more fully developed in the superseded panel opinion, the failure to accord comparable finality to comparable post-verdict acquittals results in so great an anomaly and so severe a curtailment of the unique, traditional function of federal trial judges of unilaterally "filtering out deficient prosecutions," *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 575, 97 S.Ct. 1349, 1356, 51 L.Ed.2d 642 (1977), that I think it improper to ascribe such an unexpressed intention to Congress. *See id.* at 576–81, 97 S.Ct. at 1357–59 (Stevens, J., concurring). I would instead, simply exercising the traditional power of appellate courts to determine the proper standards of review where they are not legislatively imposed, apply here a standard of absolute deference to

purely fact-based post-verdict judgments of acquittal in order to continue unimpaired that traditional, unilateral protective power and the concomitant historical right of criminal defendants to have that particular *nisi prius* determination accorded absolute finality.[7]

On that basis, I would affirm the fact-based judgment of acquittal entered here by the district judge.

WIDENER, Circuit Judge, joins in this dissent.

---

**7.** Fixing the appropriate standard of review is simply an incident of the broader power necessarily had and traditionally exercised by appellate courts ultimately to order—to the extent the legislature has not—the functional relationship between appellate and trial courts in their combined efforts to reach at last proper judgments in particular cases. This power extends not only to defining by "standards" the intensity with which particular trial court actions are reviewed but to fixing through the use of such purely judicial concepts as "plain error" the scope or ambit of those actions that are properly subject to review. Critical to the exercise of that judicial power in both its intensity and scope dimensions is a determination of the appropriate locus of finality for deciding particular legal or factual issues. In making that determination, appellate courts have always properly considered such diverse factors as maintenance of the adversary system, relative vantage points of the different levels of courts, ultimate importance of the determination, and the nature of the substantive interests affected. Many of the resulting standards and scope rules accord substantial or total finality to trial court actions that lie within the jurisdictional reach and corrective power of appellate courts on a perception that—for any number of these reasons—a particular trial court determination should be final even if "wrong." There is, in consequence, nothing conceptually unsound

nor at odds with traditional practice in according, through the device of different standards of review, finality to trial court determinations that evidence is insufficient to convict while according, by the same judicial process, non-finality to trial court determinations that it is sufficient. The ordering principle is that ancient one which at many points slants—and at this very point has always slanted—the system in ways calculated to favor the criminal defendant in matters pertaining to factual proof of his guilt. *See* 646 F.2d at 140–142 & nn.8, 9. Certainly the possibility that different standards might be appropriate here is not so untoward that a legislative intent to deny that possibility should be simply assumed. That, I submit, is nevertheless the majority's sole rationale on this decisive issue. The assumption is that our traditional power in this realm has been denied by a jurisdictional grant that does not speak to it.

*See* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction and Related Matters,* § 3919, at 356 (1981 Pocket Part), where it is suggested that such a standard of review might appropriately be adopted by the courts notwithstanding the government's right to appeal such post-verdict judgments under the 1970 Act.